## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CRIMINAL NO. 06-227-04 (RBW) |
| | : | |
| TINESHA  ADAMS, | : | Judge Reggie B. Walton |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTION FOR RECONSIDERATION OF DETENTION ORDER

***COMES NOW***, the United States of America, by and through its Attorney, the United States

Attorney for the District of Columbia, respectfully responds to the defendant's motion to have this

Court reconsider the decision of Magistrate Judge Alan Kay to hold the defendant, TINESHA

ADAMS, pending trial.  The magistrate judge found, and the record shows, that no condition nor

combination of conditions for defendant's release can reasonably assure the safety of the community.

Therefore, we ask the Court to continue to hold the defendant without bail pending trial.  In support

whereof, we submit as follows:

### BACKGROUND

The government's investigation of the narcotics conspiracy in which these defendants

participated has uncovered this large-scale, incredibly prolific, drug trafficking organization

operating between California, District of Columbia, the State of Maryland, and the Commonwealth

of Virginia.  Agents working on the case conservatively estimated that, in the last year alone, the

group was responsible for the distribution of well over 30 kilograms of phencyclidine ("PCP").

The conspiracy operated to transport gallon quantities of PCP from California to the

Washington, D.C. area for re-sale to lower level drug sellers who supplied neighborhood and street-

level sellers with PCP.  The organization was directed for the most part by DARNELL ANTHONY

JACKSON and TROY HOPKINS. Some local members of the conspiracy traveled to Los Angeles, using Long Beach Airport where they perceived the security to be more lax.[1] After arriving in the area of Compton, California, members of the conspiracy would meet with TONY FITZGERALD HILT ("T") who is believed to be a member of the Mona Park Crips and a supplier of large quantities of PCP. Indeed, FITZGERALD'S house and apartments in Los Angeles were searched on August 1, 2006.

After retrieving the gallon quantities of PCP liquid from the supplier, the conspirators (often including ADAMS) would take the liquid and place it in common containers, such as shampoo, mouth wash, or body lotion bottles. They would then place these bottles in check-in luggage. The luggage would be carried by a regular group of couriers, some of whom are charged in the Indictment in this case.

TINESHA ADAMS was a leader of this group of couriers, recruiting young people from her neighborhood in California and talking them into taking liquid PCP aboard planes. She approached them with the basic and seductive promise that they could make some money. ADAMS even recruited a young man whom she called her 'brother.' ADAMS took a cut of the fee paid to these couriers by the Washington based suppliers.

ADAMS also occasionally smoked some of the PCP that she had skimmed from these shipments. Indeed there were calls between HILT and JACKSON during the May, 2005 wiretap wherein HILT can heard complaining about ADAMS' outrageous behavior while she was under the influence of PCP.

---

[1]    Although TROY HOPKINS had previously flown into LAX and Burbank Airports, following the seizure of three gallons of PCP in January of 2004, by authorities in Los Angeles, the group began flying to Long Beach instead, and even tried to mail PCP back after this interruption.

The government has learned through its continued investigation that during ADAMS' period of fugitivity she knew she was wanted in Washington, D.C. for these offenses but did not turn herself in.

The regular couriers traveled frequently between Los Angeles and Dulles Airport during the period of the conspiracy, and flight records reveal over thirty trips by the couriers. It was the practice of the couriers to each carry approximately a gallon of PCP (which equals 3.7 kilograms of PCP) in their bags. Flight records from JetBlue Airways alone reveal that one courier, TINESHA ADAMS, made at least the following trips[2]:

1)    Trips on JetBlue Airlines:

|  |  |  |
|---|---|---|
| A) 9-10-05 | ADAMS flew from IAD to LGB |
| B) 9-27-05 | ADAMS flew from LGB to IAD |
| C) 10-1-05 | ADAMS flew from IAD to LGB |
| D) 10-17-05 | ADAMS and SHAWNTAE ANDERSON (another courier) flew from LGB to IAD |
| E) 10-21-05 | ADAMS and ANDERSON flew from IAD to LGB |
| F) 11-7-05 | ADAMS flew from LGB to IAD |
| G) 11-14-05 | ADAMS and ANDERSON flew from IAD to LGB |
| H) 11-21-05 | ADAMS flew from LGB to IAD |
| I) 11-23-05 | ADAMS flew from IAD to LGB |
| J) 1-5-06 | ADAMS flew from LGB to IAD |
| K) 1-8-06 | ADAMS flew from IAD to LGB |
| L) 2-9-06 | ADAMS flew from LGB to IAD |
| M) 2-10-06 | ADAMS flew from IAD to LGB |
| N) 4-11-06 | ADAMS flew from LGB to IAD |
| O) 4-13-06 | ADAMS flew from IAD to LGB |
| P) 4-22-06 | ADAMS flew from LGB to IAD |
| Q) 4-24-06 | ADAMS flew from IAD to LGB |
| R) 5-10-06 | ADAMS and LANIKA FRANKLIN (another courier) flew from LGB to IAD |
| S) 5-12-06 | ADAMS and FRANKLIN flew from IAD to LGB |
| T) 5-23-06 | ADAMS and FRANKLIN flew from LGB to IAD |

---

[2]    ADAMS also took Southwest and America West Airlines during her involvement in the conspiracy. TROY HOPKINS was aboard at least one of these flights with ADAMS.

Other couriers made as many as 11 trips in furtherance of the conspiracy, often in the company of one another. Many of their flights were booked by a caller who used that name "Tinesha."

The Washington area members of the conspiracy took turns traveling to California to pick up the PCP, and pay the couriers. They used Traveler's Moneygram and Western Union wire remitter services, among other methods, in order to advance monies to the couriers. They carried sums of cash on their persons to pay the drug suppliers. It was not uncommon for Washington-based members of the conspiracy to book and even pay for the California-based couriers' flights. It is interesting to note that ADAMS booked many of the flights of the other couriers, planning their travel and exercising a role as a coordinator and leader.

Specifically ADAMS received the following money transfers in furtherance of the conspiracy's aims and from other members of the conspiracy[3]:

    1)    Western Union Money Tranfers:
        A) 4-1-06, Angel George, sent $150.00, to TINESHA ADAMS
        B) 4-16-06, Tavon Adams, using the address of 303 Suitland Rd., Lanham, MD, sent $900 to TINESHA ADAMS.
        C) 4-21-06, Lashawn Brown, using the address of 524 Pacer Ave., Hyattesville, MD, sent $900 to ADAMS.
        D) 5-3-06, Hary Davis, using the address of 2206 Alice Ave., Temple Hills, MD sent $400 to ADAMS.
        E) 5-18-06, Sincere Washington, using the address of 1991 Good Luck Rd., Ft. Washington, MD, sent $900 to ADAMS.
        F) 5-19-06, Anthony Adams, using the address of 5600 Emack Avenue, Lanham, MD, sent $900 to ADAMS.
        G) 5-20-06 Vivica Brownie, using the address of 5818 Lawton Court, Lanham, MD, sent $250 to ADAMS.

---

[3]     The government's investigation has revealed that members fo the conspiracy sometimes used false or made-up names to send money in amounts that did not require the presentation of photo identification. The listed transactions show the name used, not the actual name of the sender.

4

2)    Traveler's Moneygram
        A) 5-21-06, TROY CHAVIOUS, sent $350 to ADAMS from the
        Shopper's Food Warehouse in Lanham, MD.
        B)  5-18-06, Scott Wages sent $660 from the Shopper's Food
        Warehouse, Clinton, MD to ADAMS.
        C) 2-10-06, Scott Wages sent $500 from the Shopper's Food
        Warehouse in Lanham, MD to ADAMS.

While some of the senders' names may not be familiar to this Court, agents have interviewed a large number of persons who confirm that these transfers were sent to ADAMS by those acting on behalf of the conspiracy. Other witnesses confirm that these amounts were sent to ADAMS in order to cover her incidental expenses as the leader of the couriers. It is interesting to note that at least one such money transfer was sent on May 21, 2006. Within two days after this money was sent, ADAMS and LANIKA FRANKLIN boarded the "red-eye" flight from Los Angeles in the late evening hours of May 23, 2006.

On the same day that the above-referenced money transfer occurred, HILT, who was the Compton-base supplier, complained to JACKSON on the telephone that ADAMS, who was in his house at the time, was trying on a bathing suit and behaving strangely because she had smoked PCP. Within two days prior to boarding a plane for Washington, ADAMS was in the suppliers home where members of the conspiracy often picked up PCP.

When the "red-eye" arrived at Dulles Airport, in the early morning hours of May 24, 2006, agents approached ADAMS and LANIKA FRANKLIN near the baggage carousel. The agents knew from listening to the court-ordered wiretap calls that the two women were transporting PCP for JACKSON and HOPKINS. Agents obtained consent to search the luggage of both women. They seized approximately two gallons of PCP from ADAMS and FRANKLIN at Dulles Airport on May

24, 2006.  Immediately afterwards, JACKSON and HOPKINS began discussing the implications of the seizure to the conspiracy.

ADAMS' participation in the conspiracy took her away from the four year old child for days at time.  She now attempts to suggest through her motion that the agents acted inappropriately in arresting her near her child's day care.  She fails to mention that her brother's mother, Sadie White, was present and took the child, just as she fails to acknowledge her days long absences from her child while she acted as a drug courier and supervisor of drug couriers or her drug use.[4]

ADAMS also makes much of her claimed appearance in Los Angeles Superior Court following the indictment in this case.  First, the government has no indication that she actually appeared.  Under Section 995 of the California Penal Code, defendants in certain cases can appear through their attorneys without actually attending court as long as their attorney has received written permission from the client.  Second, the bench warrant in our case was sealed at the time and would not have been accessible to court personnel in Los Angeles.  Third, ADAMS' counsel fails to mention that two separate bench warrants were issued for ADAMS in that and another case before her fraud case was ultimately dismissed.

Finally, ADAMS is a resident of Los Angeles with no ties to persons in the Washington, D.C. area, unless she counts the members of the conspiracy.  She was not employed when she was arrested and the government can find no record of her ever having been employed as an adult in any legitimate job.  She actively recruited other young people to become couriers and claimed an entitlement to a portion of their payments for her recruiting efforts.  She willfully and deliberately

---

[4]    ADAMS also fails to mention that she told the judge in the Central District of California that she was pregnant, though there is no evidence that her claim was true.

remained a fugitive during the period after the indictment.  There is no reason in the record to believe that she will ever return to court or that the community can be protected from her during the pendency of this case.

## EARLIER PROCEEDINGS

When U.S. Magistrate Judge Alan Kay arraigned the defendant, the Government asked the Court to hold her without bail pending trial, in keeping with the Bail Reform Act, 18 U.S.C. § 3142(f)(1)(C).[5]  That law presumes that persons should be jailed pending trial when charged with the crimes for which defendants have been indicted, as the defendant herein was.

At the conclusion of each hearing,  Magistrate Judge Kay ordered the defendant held without bond.

## ARGUMENT

This Court should affirm the decision to hold defendant without bail.  Congress' intent in 1984 when it enacted the current version of the Bail Reform Act:

> Many of the changes in the Bail Reform Act reflect the . . . determination that Federal bail laws must . . . give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released. . . .  The constraints of the Bail Reform Act fail to grant the Courts the authority to impose conditions of release geared toward assuring community safety, or the authority to deny release to those defendants who pose an especially grave risk to the safety of the community.  . . . ***This broad base of support for giving judges the authority to weigh risks to community safety in pretrial release decisions is a reflection of the deep public concern, which the Committee shares, about the growing problem of crimes committed by persons on release.***

---

[5]    That motion was based on 18 U.S.C. § 3142(f)(1)(C), which authorizes pre-trial detention in any case involving a crime under the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, carrying a maximum penalty of ten years or more in prison.  All of the crimes charged in the indictment carry such penalties.

<u>See</u> S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S.Code Cong. & Ad.News 3182, 3486-3487. (Emphasis added.)[6]

No condition of release nor combination of them can ensure that the defendant will not pose a danger to the community if released. This is based first upon the presumption to that effect written into the Bail Reform Act. 18 U.S.C. § 3142(e) ("Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions of release will reasonably assure the  . . .

---

[6] The Court must always consider whether defendant's release is a danger to the community. This point is made throughout the Bail Reform Act. Section 3142(e), which authorizes detention without bail pending trial, which reads:

> If, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required ***and the safety of any other person and the community***, such judicial officer ***shall order*** the detention of the person before trial.

Emphasis added. Similarly, § 3142(f) reads:

> The judicial officer shall hold a hearing to determine whether any condition of combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person ***and the safety of any other person and the community*** –
> > (1) upon motion of the attorney for the Government, in a case that involves,
> > > (C) an offense for which a maximum term of imprisonment
> > of ten years or more is prescribed in the Controlled Substances Act
> > (21 U.S.C. § 801 *et seq.*) . . .

Emphasis added. This point is again made in § 3142(g), **Factors to be considered**, which states:

> The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required ***and the safety of any other person and the community***, take into account the available information concerning –
> > (1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
> > (2) the weight of the evidence against the person;
> > (3) the history and characteristics of the person . . .
> > (4) ***the nature and seriousness of the danger to any person or the community that would be posed by the person's release. . . .***

(Emphasis added.)

safety of the community if the judicial officer finds that there is probable cause to believe that the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act.").  This presumption, triggered by indictment, is reinforced overwhelmingly by the facts of the case.

The defendant was a leader - albeit a leader of couriers - in a prolific drug conspiracy that has dumped gallons of PCP onto the streets of  Washington, D.C. and Suburban Maryland, and she is a threat to the community if she is released.  The facts set forth above embody the danger that defendant's release poses.  As the legislative history of the 1984 Bail Reform Act amendments shows:

> [T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community.  The committee intends that the concern about safety be given a broader construction than merely danger of harm involving violence. . . .  The Committee also emphasizes that the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the "safety of any other person or the community.

S.Rep. No. 225, *supra*, at 3195-3196.

Against these facts, defendant principally relies on a claim that she was in court in Los Angeles.  Again, the framers of the 1984 Bail Reform Act thought differently.  "The Committee also notes with respect to the fact of community ties that it is aware of the growing evidence that the presence of this factor does not necessarily reflect a likelihood of appearance, and has no correlation with the question of the safety of the community."  S.Rep. No. 225, supra, 3207.  Nor is it clear why community ties in California, which stopped defendants not at all from selling drugs as described above, now will keep them from doing so again.  The government has evidence that several of the defendant's family members, including, but not limited to her mother, Cynthia Jobe, and the young

9

man whom she claimed was her brother, were involved with this and other drug conspiracies, and this also informs the government's position in the response.

Counteracting the representations made by the defendant is the seriousness of the charges they face, and the strength of the government's evidence, which the Court must also consider in determining whether the defendant has overcome the presumption that there are no conditions of release that would ensure the safety of the community. 18 U.S.C. § 3142(g). Substantial seizures of PCP were made from various conspirators throughout this conspiracy investigation, and one of the largest was made from ADAMS herself. Even aside from these seizures, the government has wire interceptions demonstrating narcotics-trafficking activities from the defendant, over five cooperating witnesses who will testify against her at trial, surveillance and other evidence against her, as indicated in the proffer above. The defendant is charged with Conspiracy to Distribute and Possess with Intent to Distribute PCP; if convicted, the defendant faces a potential sentence of life.

## CONCLUSION

In summary, the magistrate judge found that the defendant's release constitutes a clear, convincing danger to the community. The order releasing them should be upheld and affirmed for the reasons set forth above and for any other reasons appearing at a hearing on this motion.

*WHEREFORE*, the United States respectfully prays this Honorable Court to affirm the findings of the Magistrate Judge to hold TINESHA ADAMS without bond pending trial.

Respectfully submitted,

_____

S. ELISA POTEAT
ASSISTANT UNITED STATES ATTORNEY
D.C. Bar No. 420604
U.S. Attorney's Office
Organized Crime & Narcotics Trafficking Section
555 4th Street, N.W., Room 4120
Washington, DC 20530
(202) 514-7067   FAX:  (202) 514-8707
Elisabeth.S.Poteat@usdoj.gov

_____

EMORY V. COLE
ASSISTANT UNITED STATES ATTORNEY

11

## CERTIFICATE OF SERVICE

I certify that, on this 2nd day of April, 2007, I have caused service of the foregoing to be made by mailing a copy, first-class postage attached, in addition to faxing or emailing to:

**Counsel for defendant Hargrove:**
Rudy Acree, Jr.
1211 Connecticut Avenue, N.W.
Suite 506
Washington, D.C. 20036

**Counsel for defendant Bryant:**
Nathan I. Silver
P.O. Box 5757
Bethesda, MD 202824

**Counsel for defendant Adams:**
Joanne Slaight
717 5th Street, N.W.
Washington, D.C. 20001

**Counsel for defendant Hilt:**
Joseph Beshouri
419 7th Street, N.W., Suite 201
Washington, D.C. 20004

_____
S. ELISA POTEAT
ASSISTANT UNITED STATES ATTORNEY

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 06-227-04 (RBW)** |
| | : | |
| **TINESHA ADAMS** | : | **Judge Reggie B. Walton** |
| | : | |
| **Defendant.** | : | |

## ORDER

This matter came before the Court on the defendant's motion for review of a decision by the

Magistrate Judge holding the defendant pending trial.  Upon consideration of that motion, it is by

the Court this _____ day of April, 2007

ORDERED, that the defendant shall be held without bond pending trial.

_____
REGGIE B. WALTON,
UNITED STATES DISTRICT JUDGE

cc:

S. Elisa Poteat and Emory V. Cole
Assistant United States Attorneys
U.S. Attorney's Office
Organized Crime & Narcotics Trafficking Section
555 4th Street, N.W., 4ᵗʰ floor
Washington, DC 20530
(202) 514-7067   FAX:  (202) 514-8707

**Counsel for defendant Hargrove:**
Rudy Acree, Jr.
1211 Connecticut Avenue, N.W.
Suite 506
Washington, D.C. 20036   (Continued notice)

1

**Counsel for defendant Bryant:**
Nathan I. Silver
P.O. Box 5757
Bethesda, MD 202824

**Counsel for defendant Adams:**
Joanne Slaight
717 5th Street, N.W.
Washington, D.C. 20001

**Counsel for defendant Hilt:**
Joseph Beshouri
419 7th Street, N.W., Suite 201
Washington, D.C. 20004